STATE OF MISSOURI on the information of ROY McKITTRICK, Attorney General, at the Relation of A. J. (OTTO) FRANK, Relator, v. ANDREW H. TEGETHOFF and LEONARD W. BROWNE.—89 S. W. (2d) 666.

Court en Banc, January 9, 1936.

*Roy McKittrick*, Attorney General, *James L. HornBostel*, Assistant Attorney General, and *John A. Nolan* for relator.

*Paul S. Limerick* for respondents.

ELLISON, C. J.—Original proceeding in the nature of *quo warranto* filed by the Attorney General at the relation of A. J. (Otto) Frank against Andrew F. Tegethoff and Leonard W. Browne, respondents, to oust them severally from the further exercise of the powers, privileges and franchises of constable in Central Township, St. Louis County, Missouri.

The relator, Frank, was elected constable of said township in the general election held in November, 1934, and duly qualified and entered upon the discharge of the duties of that office. On July 15, 1935, the county court entered an order subdividing Central township into three townships to be named and known as Normandy township, Clayton township and Jefferson township. Four days later, on July 19, the court declared the relator, Frank, to be constable of the new Normandy township, where he resided; and further appointed the respondents Tegethoff and Browne, respectively, to be constables of the newly formed Clayton and Jefferson townships for a period ending on the next general election day, or until their respective successors should be duly qualified and elected. They were duly commissioned and ever since have been and now are exercising the powers of constable in their respective townships.

The Attorney General assails these orders of the county court, and Section 12041, Revised Statutes 1929, under which they were entered, upon three grounds:

(1) That the statute does not authorize the complete destruction and dismemberment of an existing township by the division thereof into a number of new townships, at least without a vote of the people;

(2) If the statute be construed as conferring such power upon the county court, it is void and unconstitutional as an unwarranted delegation of legislative functions to the county court;

(3) The order of the county court in this case carries upon its face unmistakable evidence of an arbitrary and unreasonable exercise of its statutory power.

Before discussing the first two points made by the learned Attorney General it will be necessary to review briefly the legislation involved. Section 12041, Revised Statutes 1929, is as follows:

"Each county court may divide the county into convenient townships, and as occasion may require erect new townships, subdivide townships already established, organize better township lines, and may, upon the petition in writing *of not less than twenty-five per centum of the legally qualified voters of each township affected, as*

*such vote was cast in the last preceding general election for the office receiving the greatest number of votes in the township or townships affected,*\* consolidate two or more existing townships, into one township, or otherwise reduce the number of townships, or change the boundary lines thereof, as may be deemed advisable." (Italics and asterisk ours.)

The opening lines of the section, down to the words "and may, upon the petition in writing," have been in our statute in substantially the same form since 1835. [R. S. 1835, p. 605, sec. 1.] In the first statutory revision, Revised Statutes 1825, page 769, section 1, no provision was included expressly permitting the alteration of township lines. While the statute stood as Section 10223, Revised Statutes 1899, it was amended by Laws 1909, page 869, the title to that act reciting the amendment consisted of an additional provision "authorizing county courts to reduce the number of townships." The part added made Section 11650, Revised Statutes 1909, and Section 13162, Revised Statutes 1919, read as follows:

"Each county court may divide the county into convenient townships, and, as occasion may require, erect new townships, subdivide townships already established, or better township lines, and may, upon the petition, in writing, *of not less than fifty residents of the townships affected,* consolidate any two or more existing townships into one township, or otherwise reduce the number of townships, or change the boundary lines thereof, as may be deemed advisable." (Italics ours.)

An attempt was made by Laws 1927, page 490, to repeal the above Section 13162, Revised Statutes 1919, and to enact a new section striking out the italicized part requiring the petition for a reduction in the number of townships to be signed by fifty residents, and substituting in lieu thereof the part italicized in the present Section 12041 as we have set it out above, requiring such petitions to be signed by at least twenty-five per cent of the qualified voters, etc. But this attempt was abortive and ineffectual because the part of the sentence following the asterisk was omitted, leaving that part of the section without a verb and meaningless. This error was corrected and the statute was passed as it now stands, by Laws 1929, page 441.

I. Construing the section by its language and history we think it clear the first part thereof deals with: the original division of a county into townships after its organization; the subsequent erection of new townships, and the subdivision of townships, thereby *increasing* the number of townships; and the changing of boundary lines whether the number of townships be increased or remain the same. The statute has never required a written petition for this during the entire history of the State. The latter part of the section, which used to call for a petition signed by at least fifty

residents of the townships affected and now requires the signature of twenty-five per cent of the qualified voters, etc., contemplates a *reduction* in the number of townships by consolidation or otherwise. That is what the title of the act said when this part of the section was added by amendment in 1909.

It is true that the second part of the section, requiring a voters' petition (as well as the first part, which does not require a petition) provides for the changing of township boundary lines; and that both an increase and a decrease in the number of townships would involve a change in township lines. But we are convinced the second part of the section contemplates only such boundary changes as are connected with or incidental to a reduction in the number of townships. To hold otherwise would go counter to the intention of the lawmakers as expressed in the title of the amendment adding this part of the section in 1909, and would emasculate the first part of the section which for more than eighty years before the amendment had permitted alterations in boundary lines, the erection of new townships and the subdivision of townships without a petition. The amendment left this part of the section undisturbed; and it seems clear this would not have been done if the intent had been to change it.

But the Attorney General further points out that in counties not under township organization (and St. Louis County is not) townships do not exist for administrative purposes but only to give the inhabitants a measure of self-government, as in the election of justices of the peace and constables, and to serve as political units in the selection of political committees. It is contended that in view of these limited purposes, disassociated as they are from the administrative functions of the county court, the Legislature could not have intended to confer upon that body the unrestrained power to influence the selection of political committees and the election and tenure of township officers at its whim or caprice, by changing township boundaries, splitting up townships and the like, as might from time to time seem calculated to produce that result.

It is also suggested that the subdivision of Central township into three new townships is as complete a destruction thereof as if it had been consolidated with another township—in which latter event a petition of the voters would have been required. From all of this it is argued that the first part of the section allowing the erection of new townships and the subdivision of existing townships on the county court's own motion, does not permit the complete dismemberment of a township into new townships, but contemplates only the slicing off of parts thereof, leaving some portion of the original townships remaining as a political unit. In support of this conclusion the learned Attorney General cites State ex rel. Major, Atty. Gen., v. Patterson, 229 Mo. 364, 129 S. W. 894, and State ex rel. Major,

Atty. Gen., v. Patterson, 229 Mo. 373, 381, 391, 129 S. W. 888, 889, 892.

A reading of these cases will show at once that they deal with different statutes and are not in point on their facts. Section 12041, here involved, uses the word subdivide, which means "to divide the parts of into more parts; to divide again, as what has already been divided." [Webster's New International Dictionary (2 Ed.).] The meaning of the first part of the section is clear when it is remembered that it has been in our statutes practically since the admission of Missouri to the Union, and that it provides first for the division of the county into townships, and then for the erection of new townships and the subdivision of existing townships into other townships. We find nothing in it requring that in the subdivision of a township some part of the original must be left intact except where a petition is filed. Nor can we see that that would greatly affect the influence which the county court incidentally may exert in the selection and tenure of justices of the peace, constables and political committees in the townships of the county. For even if the court were required to leave some part of the original township intact it would be a matter more of name or form than of substance, because the court usually could select and shear off parts of a township in such manner as to influence the election of officers and committeemen in the part remaining. We hold the order of the county court of St. Louis County dividing Central township into three new townships, Normandy, Clayton and Jefferson, did not violate Section 12041, Revised Statutes 1929.

II. The next point made is that if Section 12041 permits the total destruction of a township by the subdivision of the whole thereof into new townships without a voters' petition, as we have just held, the statute is unconstitutional in that it unreasonably delegates legislative power to the county court. There is no merit in this contention. It would still be a delegation of legislative power even if a petition were required, for the people in the Constitution did not reserve to themselves the power to control the subdivision of townships by petition. But the statute does not make an unconstitutional delegation of legislative power, as it stands. Section 36, Article VI of the Constitution provides that "in each county there shall be a county court, which . . . shall have jurisdiction to transact all county *and such other business as may be prescribed by law.*" (Italics ours.) It was held by the court en banc in State ex rel. Sears v. Hall, 325 Mo. 321, 325, 28 S. W. (2d) 1026, 1027-28, that the statute (then Sec. 13162) in harmony with the Constitution defines one of the powers of county courts growing out of their supervisory control over the administrative affairs of the county. So, also, it has been held legislative power may be delegated to

circuit courts in fixing the boundaries of drainage districts. [State ex rel. Manion v. Dawson, 284 Mo. 490, 506, 225 S. W. 97, 100; In re Birmingham Drainage District, 274 Mo. 140, 153, 202 S. W. 404, 407; Houck v. Little River Drainage Dist., 248 Mo. 373, 386-387, 154 S. W. 739, 741.]

III. Finally it is contended that the county court's order on its face discloses unmistakable evidence of an arbitrary and unreasonable exercise of its power. We do not think so. Preliminary to making the order dividing Central township into the three named new townships, the county court adopted a resolution finding that Central township contained more than two-thirds of the population and registered voters of the county, and 103 voting precincts, making the governmental affairs of the township difficult to administer; that, as it appeared from a petition of the board of election commissioners, said board had been hindered in the past in the selection and qualifying of judges and clerks of election by reason of the inability of the Central township committees of the respective political parties to furnish in time lists containing double the number of names, as required by law, from which judges and clerks of election should be selected; that it appeared the election officials had in the past been unable to obtain adequate and experienced aid and police protection for the enforcement of the registration and election laws by the constabulary forces of Central township and had been compelled to employ special assistants, at great expense to the county; that it was necessary for the board of election commissioners to set up a permanent system of registration, as provided by law, and to create additional precincts in said Central township before the next election; and that all these conditions would be benefited by subdividing Central township into three convenient townships.

The learned Attorney General does not dispute the facts thus found by the county court, but, in effect, demurs thereto by arguing that they disclose on their face arbitrary action. We do not think so, if the facts recited are true, as we must take them to be in this proceeding. The argument upon which the Attorney General rests his case—under this head—is that the relator, Frank, had been duly elected by the people as the constable of Central township; and that in the midst of his term the county court completely abolished the township and created three new townships, thereby making vacancies in the office of constable in all three of such newly created townships and defeating the will of the voters. It is contended that even if the necessity for dividing Central township into three new townships existed, there was no reason why a portion of the original township should not have been left intact; and no reason why the court order could not have been made at a time, with reference to the township elections, so that the voters in the newly created townships would

have been afforded an opportunity to select their own constables, instead of having them appointed by the county court.

We cannot think this consideration alone is sufficient to invalidate the county court's order. The statute says the county court may *"as occasion may require* erect new townships, subdivide townships," etc. (Italics ours.) . It does not say such steps shall be taken only when township elections are in prospect. We are not meaning to hold that county courts cannot be guilty of abusive excesses of power under the statute; what we do say is that on the record presented in this case there is no such showing.

So far as the relator, Frank, is concerned, he has no more ground for complaint than if the county court had split off two parts of Central township, creating two new townships therefrom and appointing the respondent Tegethoff as constable in one, and respondent Browne in the other; and leaving him (Frank) still in office as constable in what was left of Central township. Because the court did declare him to be (that is, appointed him) constable in the new township in which he resided. When Central township was divided into three new townships the provisions of Section 11757, Revised Statutes 1929, applied. It says: "If any township be divided, the constable in office at the time of the division shall continue to be the constable of the township in which his residence is, and another constable shall be appointed for the other township, as in case of vacancy."

The issuance of our writ of *quo warranto* having been waived, and the cause having been submitted on the pleadings and briefs, a writ of ouster is denied. All concur.